## UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GEORGE ANTHONY JAMES**<br>4 Flagstone Drive<br>Sicklerville, NJ 08081<br><br>And<br><br>**IVONNE RIVERA**<br>1416 E. Cheltenham Avenue<br>Philadelphia, PA 19124<br><br>Individually and on Behalf of All Others<br>Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>**SOUTHEASTERN PESNNSYLVANIA<br>TRANSPORTATION AUTHORITY,**<br>1234 Market Street, 4th Floor<br>Philadelphia, PA 19107<br><br>Defendant | CASE NO.<br><br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

For their Class Action Complaint, Plaintiffs, George Anthony James and Ivonne Rivera,

on behalf of themselves and all others similarly situated, allege the following against Defendant

Southeastern Pennsylvania Transportation Authority ("SEPTA"), based on personal knowledge

as to Plaintiff and Plaintiff's own acts and on information and belief as to all other matters based

upon, *inter alia*, the investigation conducted by and through Plaintiffs' undersigned counsel:

## SUMMARY OF THE CASE

1.      SEPTA is a regional public transportation authority that operates bus, rapid transit,

commuter rail, light rail, and electric trolleybus services for nearly 4 million people in five

counties in and around Philadelphia, Pennsylvania. It also manages projects that maintain, replace

and expand its infrastructure, facilities and vehicles.

2.     In an  August 25, 2020 letter, SEPTA notified its roughly 9,300 employees that on or around August 10, 2020 SEPTA discovered that it was subject to a malware attack and that their personal information, including their names, Social Security numbers, addresses, benefits enrollment information, salary or hourly rate, as well as bank account and routing numbers had been compromised.



3.     Similarly, it is believed, and therefore averred, that individuals who have asserted personal injury claims against SEPTA, likewise, and as a result supplied SEPTA with personal information, including medical records, tax returns, W-2 statements, Social Security numbers, also may have had their personal information compromised as a result of this attack.

4.     SEPTA entered a stipulation in the case of *Christian v. King*, Philadelphia County Court of Common Pleas, May Term, 2020, No. 349, in which SEPTA confirmed that its litigation files were subject to the malware attack and that SEPTA was no longer able to access its own litigation files.

5.      Specifically, SEPTA stated that, SEPTA "has suffered a malware attack which has disabled its Electronic Files, which includes its litigation files[.]"

| TIMOTHY CHRISTIAN,<br>    Plaintiff<br><br>    v.<br><br>SOUTHEASTERN PENNSYLVANIA<br>TRANSPORTATION AUTHORITY,<br>    Defendant | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br>CIVIL TRIAL DIVISION<br><br>MAY TERM, 2020<br>No. 349 |

*Filed and Attested by the Office of Judicial Records 30 CON 2020 12:44 pm*

**STIPULATED ORDER**

**WHEREFORE**, Southeastern Pennsylvania Transportation Authority ("SEPTA") has suffered a malware attack which has disabled its Electronic Files, which includes its litigation files;

6.      The Philadelphia Court of Common Pleas subsequently issued an Order staying all civil litigation involving SEPTA "due to the inability of [SEPTA], to access its litigation data due to a malware attack…."

**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**TRIAL DIVISION**

**Administrative Order**
52 of 2020

In re: *Stay of Litigation Involving SEPTA*

**ORDER**

AND NOW, this  2nd day of September, 2020 the Court having been made aware of the stay issued on August 31, 2020 in the case captioned: Christian v. King, Case ID 200500349, due to the inability of the Southeastern Pennsylvania Transportation Authority ("SEPTA"), to access its litigation data due to a malware attack, and it appearing that SEPTA is unable to contact witnesses, timely respond to pleadings, conduct discovery, or otherwise proceed with litigation pending in the Court of Common Pleas – Trial Division in which SEPTA is a party because of the malware attack, **it is hereby ORDERED** and **DECREED** that in order to safeguard the rights of the parties in all litigation pending in the Court of Common Pleas – Trial Division, all cases in which SEPTA is a named party are stayed and shall be placed in deferred status as provided below.

7.      SEPTA was negligent in failing to adequately maintain and protect this sensitive information, which allowed hackers and other nefarious actors to access and potentially siphon off this sensitive information for unsavory and illegal purposes.

8.      This Class Action Complaint is filed on behalf of all persons described more fully

in the following sections, whose sensitive personal information was accessed and potentially compromised and/or stolen in the SEPTA data breach.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this litigation pursuant to 28 U.S.C. § 1332(d), as the matter is brought as a class action under Rule 23 of the Federal Rules of Civil Procedure, and the sum of the amount in controversy exceeds $5,000,000.  The requirement of minimal diversity is met as the dispute is between a citizen of New Jersey and a Defendant from Pennsylvania.  *See* 28 U.S.C. § 1332(d)(2)(A).

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because SEPTA maintains its principal place of business in this district and at least one of the Plaintiffs resides in this district.

## PARTIES

A.      **Plaintiffs**

11.     Plaintiff George Anthony James is a resident and citizen of the state of New Jersey. On or about September 2, 2020, Plaintiff reviewed news accounts, as well as a notification from SEPTA dated August 25, 2020 indicating that his account and sensitive personal information may have been compromised in the data breach. In addition to the damages detailed herein, the data breach has caused Plaintiff, George Anthony James, to be at substantial risk for further identity theft.

12.     Plaintiff Ivonne Rivera is a resident and citizen of the Commonwealth of Pennsylvania.  On or about September 2, 2020, Plaintiff reviewed news accounts indicating that her account and sensitive personal information may have been compromised in the data breach. In addition to the damages detailed herein, the data breach has caused Plaintiff, Ivonne Rivera, to be at substantial risk for further identity theft.

13.     Plaintiffs have taken great steps to protect their sensitive personal information, including shredding documents containing sensitive information, not transmitting their personal information via un-encrypted means, regularly monitoring their credit reports, and entrusting their personal information only to entities that represent they follow industry-standard guidelines for the protection and storage of such information.

**B.     Defendant**

14.     Defendant SEPTA is a regional public transportation authority that operates bus, rapid transit, commuter rail, light rail, and electric trolleybus services for nearly 4 million people in five counties in and around Philadelphia, Pennsylvania. It also manages projects that maintain, replace and expand its infrastructure, facilities and vehicles.   SEPTA also conducts certain business operations in New Jersey.

## FACTUAL BACKGROUND

**A.     SEPTA's Inadequate Data Security Allows for the Data breach of Sensitive Information**

15.     In an August 25, 2020 letter, SEPTA informed its employees and the public of a previously unreported attack on its network that may have exposed their sensitive personal information to a malware attack.

16.     According to the August 25, 2020 letter, SEPTA first became aware of "unusual activity" on the SEPTA network on August 10, 2020.

17.     SEPTA's investigation revealed that SEPTA's network had been infiltrated by a malware attack and that SEPTA's inadequate cyber and data security systems and measures allowed those responsible for the malware attack to obtain files containing a treasure trove of thousands of SEPTA employees' personal, private, and sensitive information including but not limited to employees' names, addresses, Social Security numbers, benefits enrollment information, salary or hourly rate, and—for those employees who used direct deposit—bank

accounts and routing numbers.

18.    It is not clear how long SEPTA's inadequate cyber and data security systems and measures allowed those inflicting out the Data breach to access SEPTA's systems and files and potentially siphon off data and personal, private, and sensitive information.

19.    SEPTA employees were required to provide the above personal, private, and sensitive information to SEPTA as a condition of employment.

20.    Similarly, the third-party litigation files on SEPTA's systems contained personal, private, and sensitive information of third parties, including third-party plaintiffs, who were involved in past or current litigation against SEPTA.

21.    The third-party litigants were required to provide SEPTA with the aforesaid personal, private, and sensitive information as a condition of the third-party litigation and as a result of SEPTA's requests for same.

22.    SEPTA entered a stipulation in the case of *Christian v. King*, Philadelphia County Court of Common Pleas, May Term, 2020, No. 349, in which SEPTA confirmed that its litigation files were subject to the malware attack and that SEPTA was no longer able to access its own litigation files.

23.    Specifically, SEPTA stated that, SEPTA "has suffered a malware attack which has disabled its Electronic Files, which includes its litigation files[.]"

24.    As a result of SEPTA's inadequate cyber and data security systems and measures, SEPTA essentially provided those responsible for carrying out the Data breach with all the information they would ever need to steal the identity of thousands of employees and third-party litigants on a silver platter.

25.    This is not the first data breach that SEPTA has been a victim of.  Approximately a year ago, SEPTA's online store, which sold SEPTA-related merchandise, was a victim of a similar malware attack which caused SEPTA to permanently shut down its online store.

26.    Despite this malware attack only a year prior, upon information and belief, SEPTA took completely inadequate steps to address the gaping holes in its cyber and data security systems and measures to prevent a future similar attack.  SEPTA's failures in this regard allowed the instant Data breach to occur.

**B.    Personal Data Very Valuable on the Black Market**

27.    The types of personal data compromised and potentially stolen in the SEPTA data breach is highly valuable to identity thieves. The data acquired, including names, Social Security numbers, addresses, benefits enrollment information, salary or hourly rate, as well as bank account and routing numbers, can all be used to gain access to a variety of existing accounts and websites to drain assets, bank accounts or open phony credit cards.

28.    Identity thieves can also use this data to harm Plaintiffs and Class members through embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits. A Presidential Report on identity theft from 2008 states that:

> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

29.    To put it into context, as demonstrated in the chart below, the 2013 Norton Report, based on one of the largest consumer cybercrime studies ever conducted, estimated that the global

price tag of cybercrime was around $113 billion at that time, with the average cost per victim being $298 dollars.



30.    The problems associated with identity theft are exacerbated by the fact that many identity thieves will wait years before attempting to use the data they have obtained. Indeed, in order to protect themselves, Class members will need to remain vigilant against unauthorized data use for years and decades to come.

31.    Once stolen, this sensitive data can be used in a number of different ways. One of the most common is that it is offered for sale on the "dark web," a heavily encrypted part of the Internet that makes it difficult for authorities to detect the location or owners of a website. The dark web is not indexed by normal search engines such as Google and is only accessible using a Tor browser (or similar tool), which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling illegal items such as weapons, drugs, and stolen personal data. Websites appear and disappear quickly, making it a very dynamic environment.

32.    Once someone buys stolen data, it is then used to gain access to different areas of the victim's digital life, including bank accounts, social media, and credit card details. During that

process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

**C.    The SEPTA Data breach Caused Harm and Will Result in Additional Fraud**

33.    The ramifications of SEPTA's failure to keep Plaintiffs' and Class members' data secure are severe.

34.    Consumer victims of data breaches are much more likely to become victim of identity fraud. According to the 2019 Identity Fraud Study from Javelin Strategy & Research, identity fraud victims in 2018 bore a heavy financial burden: 3.3 million people were held responsible for some of the liability of the fraud committed against them, nearly three times as many as in 2016. Moreover, these victims' out-of-pocket fraud costs more than doubled from 2016 to 2018 to $1.7 billion.[1]

35.    New account fraud losses also rose slightly, with criminals beginning to focus their attention on different financial accounts, such as loyalty and rewards programs and retirement accounts.[2] Additionally, criminals are becoming adept at foiling authentication processes, particularly mobile phone account takeovers. These takeovers nearly doubled to 680,000 victims in 2018, compared with 380,000 in 2017.[3]

36.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."

37.    The type of data compromised in the SEPTA Data breach is a valuable commodity to identity thieves once the information has been compromised. As the FTC recognizes, once

---

[1] "Facts + Statistics: Identity theft and cybercrime" (available at: https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime)(last visited September 3, 2020).

[2] *Id.*
[3] *Id.*

identity thieves have personal information, "they can drain your bank account, run up your credit cards, open new utility accounts, or get medical treatment on your health insurance."

38.    Identity thieves can use personal information, such as that of Plaintiffs and Class members, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

39.    Analysis of a 2016 survey of 5,028 consumers found "The quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act."

40.    Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. After conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.

41.    An independent financial services industry research study conducted for BillGuard—a private enterprise that automates the consumer task of finding unauthorized transactions that might otherwise go undetected—calculated the average per-consumer cost of all unauthorized transactions at roughly US $215 per cardholder incurring these charges, some portion of which could go undetected and thus must be paid entirely out-of-pocket by consumer victims of account or identity misuse.

42.    There may be a time lag between when harm occurs versus when it is discovered, and also between when personal data is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[22]

43.    Thus, Plaintiffs and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and the Class are incurring and will continue to incur such damages in addition to any fraudulent credit and debit card charges incurred by them and the resulting loss of use of their credit and access to funds, regardless of whether such charges are ultimately reimbursed by banks and credit card companies.

**D.    Plaintiffs and Class Members Suffered Damages**

44.    The compromised and potentially stolen information of Plaintiffs and Class members is private and sensitive in nature and was left inadequately protected by SEPTA. Defendant did not obtain Plaintiffs' and Class members' consent to disclose this data to any other person as required by applicable law and industry standards.

45.    The Data breach was a direct and proximate result of SEPTA's failure to properly safeguard and protect Plaintiffs' and Class members' personal data from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including the failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class members' sensitive personal information to protect against reasonably foreseeable threats to the security or integrity of such information.

46.    Had SEPTA remedied the deficiencies in its information storage and security

systems, followed industry guidelines, and adopted security measures recommended by experts in the field, SEPTA would have prevented intrusion into its information storage and security systems and, ultimately, the potential theft of Plaintiffs' and the Class Members' confidential personal, sensitive, and private information and data.

47.     As a direct and proximate result of SEPTA's wrongful actions and inaction and the resulting data breach, Plaintiffs and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the data breach on their lives including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports. This time has been lost forever and cannot be recaptured.

48.     SEPTA's wrongful actions and inaction directly and proximately caused the potential theft and dissemination into the public domain of Plaintiffs' and Class members' personal data, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

    a.  theft of their personal and financial information;

    b.  unauthorized charges on their debit and credit card accounts;

    c.  the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their credit/debit card and personal information being placed in the hands of criminals and misused via the sale of Plaintiffs' and Class members' information on the Internet's black market;

    d.  the untimely and inadequate notification of the data breach;

e.  the improper disclosure of their personal data;

f.  loss of privacy;

g.  ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach;

h.  ascertainable losses in the form of deprivation of the value of their personal data, for which there is a well-established national and international market;

i.  ascertainable losses in the form of the loss of cash back or other benefits as a result of their inability to use certain accounts and cards affected by the data breach;

j.  loss of use of, and access to, their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse credit notations; and,

k.  the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the data breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience, nuisance and annoyance of dealing with all such issues resulting from the Data breach.

**E.    SEPTA's Offer of Credit Monitoring is Inadequate**

49.    At present, SEPTA has offered one year of free enrollment in identity monitoring provided by Kroll to SEPTA employees only.

50.    As previously alleged, Plaintiffs' and the Class Members' personal data may exist on the Dark Web and in the public domain for months, or even years, before it is used for ill gains and actions. With only one year of monitoring, and no form of insurance or other protection,

Plaintiffs and Class Members remain unprotected from the real and long-term threats against their personal, sensitive, and private data.

51.    Therefore, the "monitoring" services offered by SEPTA are inadequate, and Plaintiffs and Class Members have a real and cognizable interest in obtaining equitable relief, in addition to the monetary relief requested herein.

## CLASS ACTION ALLEGATIONS

52.    Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs, individually and on behalf of all others similarly situated, brings this lawsuit on behalf of themselves and as a class action on behalf of the following class:

> All persons whose personal data was accessed, compromised, or stolen from SEPTA as a result of the unusual network activity identified by SEPTA in August 2020.

53.    Plaintiff James on behalf of a New Jersey Rule 23(b)(3) sub-class:

> All persons in the State of New Jersey whose personally data was accessed, compromised stolen from SEPTA as a result of the unusual network activity identified by SEPTA in August 2020.

54.    Excluded from the Class are Defendant and any entities in which any Defendant or its subsidiaries or affiliates have a controlling interest, and Defendant's officers, agents, and employees. Also excluded from the Class are the judge assigned to this action, members of the judge's staff, and any member of the judge's immediate family.

55.    **Numerosity:** The members of each Class are so numerous that joinder of all members of any Class would be impracticable. Plaintiffs reasonably believes that Class members number in the thousands and at least in the hundreds for the New Jersey subclass. The names and addresses of Class members are identifiable through documents maintained by Defendant.

56.    **Commonality and Rule 23(b)(3) Predominance:** This action involves common questions of law or fact, which predominate over any questions affecting individual Class

members, including:

    i.    Whether Defendant represented to the Class that it would safeguard Class members' personal data;

    ii.    Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their personal data;

    iii.    Whether Defendant breached a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their personal data;

    iv.    Whether Class members' personal data was accessed, compromised, or stolen in the data breach;

    v.    Whether Defendant knew about the data breach before it was announced to the public and Defendant failed to timely notify the public of the data breach;

    vi.    Whether Plaintiffs and the Class are entitled to equitable relief, including, but not limited to, injunctive relief and restitution;

    vii.    Whether SEPTA promptly notified members of the New Jersey sub-class once it learned of the attack; and

    viii.    Whether Plaintiffs and the other Class members are entitled to actual or other forms of damages, and other monetary relief

57.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of their respective classes because, among other things, Plaintiffs and the other Class members were injured through the substantially uniform misconduct by Defendant. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of other Class members arise from the same operative facts and are based on the same legal theories.

58.    **Adequacy of Representation:** Plaintiffs are adequate representatives of the classes because their interests do not conflict with the interests of the other Class members they seek to represent; they ha retained counsel competent and experienced in complex class action litigation

and Plaintiffs will prosecute this action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

59.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other members of their respective classes are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

60.    **Declaratory / Injunctive Relief Rule 23(b)(2)**: Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

**<u>CLAIMS ALLEGED ON BEHALF OF THE CLASS</u>**

**<u>First Claim for Relief</u>**
**Negligence**

61.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the preceding paragraphs as though fully stated herein.

62.    Defendant owed a duty to Plaintiffs and the Class to exercise reasonable care in safeguarding and protecting their personal data and keeping it from being compromised, lost,

stolen, misused, and or/disclosed to unauthorized parties. This duty included, among other things, designing, maintaining, and testing Defendant's security systems to ensure the personal data of Plaintiffs' and the Class was adequately secured and protected, including using encryption technologies. Defendant further had a duty to implement processes that would detect a breach of its security system in a timely manner.

63.     SEPTA was under a basic duty to act with reasonable care when it undertook to collect, create, and store Plaintiff and the Class's sensitive data on its computer system, fully aware - as any reasonable entity of its size would be - of the prevalence of data breaches and the resulting harm such a breach would cause. The recognition of SEPTA's duty to act reasonably in this context is consistent with, *inter alia*, the Restatement (Second) of Torts § 302B (1965), which recounts a basic principle: an act or omission may be negligent if the actor realizes or should realize it involves an unreasonable risk of harm to another, even if the harm occurs through the criminal acts of a third party.

64.     Defendant knew that the personal data of Plaintiffs and the Class was personal and sensitive information that is valuable to identity thieves and other criminals. Defendant also knew of the serious harms that could happen if the personal data of Plaintiffs and the Class was wrongfully disclosed, that disclosure was not fixed.

65.     By being entrusted by Plaintiffs and the Class to safeguard their personal data, Defendant had a special relationship with Plaintiffs and the Class. Plaintiffs and the Class agreed to provide their personal data with the understanding that Defendant would take appropriate measures to protect it, and would inform Plaintiffs and the Class of any security concerns that might call for action by Plaintiffs and the Class.

66.     Defendant breached its duty to exercise reasonable care in safeguarding and protecting Plaintiffs' and the Class members' personal data by failing to adopt, implement, and

maintain adequate security measures to safeguard that information, despite repeated failures and intrusions, and allowing unauthorized access to Plaintiffs' and the other Class member's personal data.

67.    Defendant's breaches of these duties were not merely isolated incidents or small mishaps. Rather, the breaches of the duties set forth above resulted from a long-term company-wide refusal by Defendant to acknowledge and correct serious and ongoing data security problems again, as evidenced by this vulnerability existing due to an earlier data breach.

68.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and the Class, their personal data would not have been compromised, stolen, and viewed by unauthorized persons. Defendant's negligence was a direct and legal cause of the theft of the personal data of Plaintiffs and the Class and all resulting damages.

69.    The injury and harm suffered by Plaintiffs and the Class members was the reasonably foreseeable result of Defendant's failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and the other Class members' personal data. Defendant knew its systems and technologies for processing and securing the personal data of Plaintiffs and the Class had numerous security vulnerabilities.

70.    As a result of this misconduct by Defendant, the personal data of Plaintiffs and the Class were compromised, placing them at a greater risk of identity theft and subjecting them to identity theft, and their personal data was disclosed to third parties without their consent. Plaintiffs and Class members also suffered diminution in value of their personal data in that it is now easily available to hackers on the Dark Web. Plaintiffs and the Class have also suffered consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

## Second Claim for Relief
### Negligence *Per Se*

71.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the preceding paragraphs though fully stated herein.

72.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as SEPTA, of failing to use reasonable measures to protect personal data. The FTC publications and orders described above also form part of the basis of SEPTA's duty in this regard.

73.     SEPTA violated Section 5 of the FTC Act by failing to use reasonable measures to protect personal data and not complying with applicable industry standards, as described in detail herein.

74.     SEPTA's violation of Section 5 of the FTC Act constitutes negligence *per se*.

75.     Plaintiffs and Class members are within the class of persons that the FTC Act was intended to protect.

76.     The harm that occurred as a result of the data breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

77.     As a direct and proximate result of SEPTA's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from identity theft; Plaintiffs' inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the data breach and/or false or fraudulent charges stemming from the data breach, including but not limited to late fees charged and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the data breach on their lives, including, *inter alia*, by placing "freezes" and "alerts" with credit

reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports, and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy.

78.     Additionally, as a direct and proximate result of SEPTA's negligence *per se*, Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of their personal data, which remain in SEPTA's possession and is subject to further unauthorized disclosures so long as SEPTA fails to undertake appropriate and adequate measures to protect their personal data in its continued possession.

### Third Claim for Relief
**Breach of Confidence**

79.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the preceding paragraphs as though fully stated herein.

80.     At all times during Plaintiffs' and Class Members' interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiffs' and Class Members' personal data that Plaintiffs and Class Members provided to Defendant.

81.     As alleged herein and above, Defendant's relationship with Plaintiffs and Class Members was governed by expectations that Plaintiffs' and Class Members' personal data would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

82.     Plaintiffs and Class Members provided their respective personal data to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the personal data to be disseminated to any unauthorized parties.

83.     Plaintiffs and Class Members also provided their respective personal data to

Defendant with the explicit and implicit understanding that Defendant would take precautions to protect that personal data from unauthorized disclosure, such as following basic principles of information security practices.

84.     Defendant voluntarily received in confidence Plaintiffs' and Class Members' personal data with the understanding that the personal data would not be disclosed or disseminated to the public or any unauthorized third parties.

85.     Due to Defendant's failure to prevent, detect, and/or avoid the data breach from occurring by, *inter alia*, failing to follow best information security practices to secure Plaintiffs' and Class Members' personal data, Plaintiffs' and Class Members' personal data was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class Members' confidence, and without their express permission.

86.     As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiffs and Class Members have suffered damages.

87.     But for Defendant's disclosure of Plaintiffs' and Class Members' personal data in violation of the parties' understanding of confidence, their personal data would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendant's Data breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' personal data, as well as the resulting damages.

88.     The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiffs' and Class Members' personal data. Defendant knew its computer systems and technologies for accepting and securing Plaintiffs' and Class Members' personal data had numerous security vulnerabilities because Defendant failed to observe industry standard information security practices, including Defendant's knowledge of a prior data breach in 2019.

89.     As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from identity theft; Plaintiffs' inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the data breach and/or false or fraudulent charges stemming from the data breach, including but not limited to late fees charged and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the data breach on their lives, including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports, and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy

90.     As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

### Fourth Claim for Relief
**Violation of the New Jersey Consumer Fraud Act
(On behalf of the New Jersey subclass Only)**

91.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the preceding paragraphs as though fully stated herein.

92.     The New Jersey Consumer Fraud Act (the "Act") places specific requirements on any business operating in New Jersey, such as SEPTA, in the event of a data breach.  *See* N.J.S.A. 56:8-161, *et seq.*

93.     The Act, at N.J.S.A. 56:8-163(a), provides:

> Any business that conducts business in New Jersey, or any public entity that compiles or maintains computerized records that include personal information, shall disclose any breach of security of those computerized records following discovery or notification of the breach to any customer who is a resident of New Jersey whose personal information was, or is reasonably believed to have been, accessed by an unauthorized person. ***The disclosure to a customer shall be made in the most expedient time possible and without unreasonable delay***, consistent with the legitimate needs of law enforcement, as provided in subsection c. of this section, or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system.  Disclosure of a breach of security to a customer shall not be required under this section if the business or public entity establishes that misuse of the information is not reasonably possible.  Any determination shall be documented in writing and retained for five years.

94.     The Act, at N.J.S.A. 56:8-161, defines "customer" as "an individual who provides personal information to a business."

95.     Plaintiff and the Class Members who are residents of New Jersey were required to provide their personal information to SEPTA and are thus "customers" under the Act.

96.     Defendant SEPTA knew of the data breach by August 10, 2020 at the absolute latest about the breach.

97.     Despite this, SEPTA did not notify Plaintiff and the Class Members until over two weeks later on August 25, 2020, and in some cases is yet to notify them.

98.     Defendant SEPTA thus violated the Act by failing to disclose the data breach and the unauthorized access of Plaintiffs' and the Class Members' personal information "in the most expedient time possible and without unreasonable delay[.]"

99.      As a direct and proximate result of SEPTA's violation of the New Jersey Consumer Fraud Act, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from identity theft; Plaintiffs' inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the data breach and/or false or fraudulent charges stemming from the data breach, including but not limited to late fees charged and foregone cash back rewards; damages from lost time and effort to mitigate

the actual and potential impact of the data breach on their lives, including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports, and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy.

100.    Additionally, as a direct and proximate result of SEPTA's violations of the New Jersey Consumer Fraud Act, Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of their personal data, which remain in SEPTA's possession and is subject to further unauthorized disclosures so long as SEPTA fails to undertake appropriate and adequate measures to protect their personal data in its continued possession.

101.    Plaintiff on behalf of himself and the New Jersey sub-class demand all available damages under the Act, including statutory penalties, trebling, attorneys' fees and costs of suit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, both individually and on behalf of the other Class members, respectfully request this Court enter an Order:

(a)    Certifying the Class, and appointing Plaintiffs as Class Representatives;

(b)    Finding that Defendant's conduct was negligent, deceptive, unfair, and unlawful as alleged herein;

(c)    Enjoining Defendant from engaging in further negligent, deceptive, unfair, and unlawful business practices alleged herein;

(d)    Awarding Plaintiffs and the Class members actual, compensatory, and consequential damages;

(e)    Awarding Plaintiff and the New Jersey sub-class all available damages under the

Act, including penalties and trebling;

(f)    Requiring Defendant to provide appropriate credit monitoring services to Plaintiffs and the other class members;

(g)    Awarding Plaintiffs and the Class members punitive damages;

(h)    Awarding Plaintiffs and the Class members pre-judgment and post-judgment interest;

(i)    Awarding Plaintiff attorneys' fees and costs pursuant to the NJ CFA; and

(j)    Granting such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

SALTZ MONGELUZZI & BENDESKY P.C.

By:____/s/ Robert J. Mongeluzzi_____
        Robert J. Mongeluzzi
        Jeffrey P. Goodman
        Samuel B. Dordick
        One Liberty Place
        1650 Market Street, 52nd Floor
        Philadelphia, Pennsylvania  19103
        Tel:  (215) 496-8282
        rmongeluzzi@smbb.com
        jgoodman@smbb.com
        sdordick@smbb.com

SALTZ MONGELUZZI & BENDESKY P.C.
        Patrick Howard
        120 Gibraltar Road, Suite 218
        Horsham, Pennsylvania 19044
        Tel:  (215) 496-8282
        phoward@smbb.com